**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ALLIANCE FOR WATER EFFICIENCY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 14 C 115** |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **JAMES FRYER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

**INTRODUCTION AND FACTUAL BACKGROUND**

**A.**

Alliance for Water Efficiency ("AWE") is an advocate for "water efficient products and programs, and provides information and assistance on water conservation efforts." [Dkt. 5, Amended Complaint, ¶ 6]. James Fryer is an environmental scientist, providing environmental and water resource management services, research, and analysis to a variety of governmental and non-governmental clients, focused on conservation, sustainable watershed, and water resource projects. [*Id.,* ¶. 3]. Allegedly dissatisfied with Mr. Fryer's work on a project relating to an AWE water conservation project ("the Project"), AWE sued Mr. Fryer, claiming that he had breached their agreement regarding the Project.

The Amended Complaint alleged that the "participating organizations" that provided funding for the Project were dissatisfied with Mr. Fryer's work and would only provide funding if AWE agreed to certain contractual obligations regarding control over the study and the funding money.

1

[*Id.,* ¶ 12, *et seq.*]. In fact, it was alleged that the funding and grant participants in the study, who comprised what was known as the Project Advisory Committee ("PAC"), would not have provided the required money for the Project but for AWE's involvement and had "expressed their unhappiness with the content and conclusions of the [Draft] Report" prepared by Mr. Fryer and suggested changes. [*Id.,* ¶ 29].[1]

According to the Amended Complaint, their objections were serious, involving what the funding participants perceived as "significant problems" with the report's "confusing terminology, lack of rigorous statistical analysis, unsupported conclusions, weak description of methodology, and a lack of focus and treating conjecture as facts." [*Id.,* ¶ 31]. This, it was alleged, rendered the Draft Report "significantly flawed." Consequently, the funding participants had "concluded that the project had to be refocused, that Mr. Fryer should be removed as the Project Manager and that AWE should finish the Project and final report...." [*Id.,* ¶ 33]. Of course, Mr. Fryer saw things quite differently.

It was against this contentious and polarized background that a settlement conference was held with the parties and their counsel on March 13, 2014. After four hours of negotiation, a settlement was reached, and its provisions placed on the record as suggested by *Lynch, Inc. v. SamataMason Inc.* 279 F.3d 487, 490-491 (7th Cir. 2002).[2] The parties agreed that although their settlement contemplated a future written document, the execution of that document was not a precondition to contract formation, and that there was a binding settlement agreement that day. [*See*

---

[1] The entities funding the Project were the: Metropolitan Water District of Southern California; Irvine Ranch Water District; Inland Empire Utilities; San Antonio Water System; City of Boulder, Colorado; Sonoma County Water Agency; Walton Family Foundation (through a grant to AWE); and California Depa11ment of Water Resources ("DWR").

[2] A copy of the transcript reflecting the terms to which the parties agreed at the conclusion of the settlement conference is attached as Exhibit 1 to the plaintiff's Motion to Enforce the Settlement. [Dkt.37].

Dkt. 26; 34, Ex. 1 at 2].[3]

The core provision of the settlement agreement – the parties designated it as "point one" of discussion and of the agreement– was that the parties were to go their "separate ways." (Ex. 1 at 15, 16, 18). Even Mr. Fryer's lawyer characterized this separateness as the "key concern." (Ex. 1 at 16). It was agreed that there would be separate reports, with Mr. Fryer preparing "his own report" for his client, DWR (California Department of Water Resources) and AWE preparing its own report for the several entities that comprised the Project Advisory Committee, whose alleged concerns about Mr. Fryer and his report ultimately sparked the lawsuit by AWE. [Dkt 34, Motion To Enforce Settlement Agreement, Ex. 1, Tr. at 2, 10, 13, 15-16, 18].

Consistent with the parties' agreement to go "their separate ways," it was agreed that Mr. Fryer would "remove" from his report all references to AWE. "Conversely," AWE's "own report for the remaining funding participants of the Project Advisory Committee, excluding DWR," would not contain "any reference to Mr. Fryer and will not deal with DWR." (Dkt. 34, Ex. 1, Tr. at 2). It was agreed that AWE's report could utilize the raw data Mr. Fryer had obtained and required that

---

[3] Illinois is averse to enforcing tentative agreements that are contingent on the signing of formal or final documents. *PFT Roberson, Inc. v. Volvo Trucks North America, Inc*., 420 F.3d 728, 731 (7th Cir. 2005). In such cases, there is no enforceable agreement until the document has been executed even if the parties agree point-by-point on its provisions. *Lambert Court v. Evans*, 575 F.2d 132, 135 (7th Cir. 1978); *In re Marriage of Lorton,* 203 Ill.App.3d 823, 827 (5th Dist. 1990). *Cf.*, *Empro Mfg. Co., Inc. v. Ball-Co Mfg*., Inc. 870 F.2d 423, 425 (7th Cir.1989).

But the March 13th agreement was not of that kind. It was rather one where the parties intended a future writing merely as an expression in more formal terms of their otherwise binding agreement. In that context, refusal to execute the written agreement does not vitiate the oral agreement. *See Ceres INC. V. Ill. Scrap Processing, Inc.,* 114 Ill. 2d 133 (1986); *Citadel Group Ltd. v. Washington Regional Medical Center,* 692 F.3d 580, 588-589 (7th Cir. 2012); *Abbott Laboratories v. Alpha Therapeutic Corp.,* 164 F.3d 385, 388 (7th Cir.1999). In Illinois, as elsewhere, it is all a question of intent as to whether the execution of a written agreement is a precondition to contract formation. *Lambert Court*, 575 F.2d at 135; *Empro Mfg. Co.*, *supra*. In the instant case, the parties expressly agreed that it was not.

Mr. Fryer turn over all the utility data from the Utilities with which he had dealt. AWE was to obtain releases from those Utilities. (Dkt. 34, Ex. 1, Tr. at 3-4). It was agreed that Mr. Fryer would not be precluded from commenting on or criticizing AWE's separate report once it was finished. (Ex. 1, Tr. at 7).

Shortly before 5:00 p.m., as the parties were preparing to leave the courtroom, Mr. Fryer apologized for "bring[ing] this up" given the lateness of the hour. Then, in seeming contradiction of what was the announced core of the deal – namely the parties were to go their "separate ways" (Ex. 1, Tr. at 15-16, 18) [4] – he said that he "never in any of my settlement offers agreed to exclude the other utilities [i.e. the PAC members] from finalizing my report." His position was that since the PAC members on whose behalf AWE was writing its separate report had "funded a large part of it," he felt he could not exclude mentioning them in his report. The decision, he said, whether to participate in the finalization of his report was or should be "their choice." (Ex. 1, Tr. at 10).

Mr. Fryer's counsel said that although she was not "quite sure" what Mr. Fryer was attempting to convey, she thought what he meant was that he did not think that he could "bind" the members of the Project Advisory Committee, and that if they wanted to "participate in Mr. Fryer's report, we can't stop them." (Ex. 1 at 11). Mr. Fryer confirmed that this was the issue he had in mind. (Ex. 1 at 12).

While AWE's counsel said that while Mr. Fryer would be free to send his *completed report* to anyone he chose, he could not, under the settlement agreement, "solicit" any of the PAC members for which AWE would be preparing its report, to participate in Mr. Fryer's report – which in any

---

[4] Indeed, the parties agreed that this was "point one" on the' list of agreed items. *See, e.g.,* Dkt. 34, Ex. 1, Tr. at 10, 16.

event Mr. Fryer had said during the settlement conference was "basically done," (Ex. 1 at 11), the implication, being that there was no need for Mr. Fryer to solicit anybody to finalize a report that needed no finalization.

But Mr. Fryer's counsel thought the issue under discussion was broader than that. For her, it was whether Mr. Fryer could actively solicit the participation of the entities on whose behalf AWE would be preparing its report. (Ex. 1, Tr. at 13, 15).[5] She thought he could. (Ex. 1, Tr. at 16).[6] Mr. Fryer's counsel acknowledged that under the agreement, Mr. Fryer would prepare his report "for his client, the Department of Water Resources and finish that report," and AWE would be preparing its report for the PAC members, which, she described, as "part of the AWE project." She said what she "want[ed] to make sure is that we're not making these poor people be a Project Advisory Committee now on two reports all over again." (Ex. 1 at 15).

While conceding that the parties had "agreed to go [their] separate ways," *id.*, she thought it perfectly consistent with the agreement that if members of the Project Advisory Committee contacted Mr. Fryer and "want[ed] input" into his report, Mr. Fryer should not be precluded from accepting their participation. Counsel for AWE agreed. (Ex. 1 at 16-17).[7] Counsel for AWE said that the very concept of two separate reports was incompatible with either AWE or Mr. Fryer

---

[5] Quite obviously, under those circumstances, Mr. Fryer necessarily would be free to note their participation in his finalized report if he chose to do so. Any other interpretation would make no sense.

[6] It was agreed that Mr. Fryer could provide his "finished report" to the members of the Advisory Committee on whose behalf AWE would be preparing its separate report. Similarly, upon completion, AWE was free to send a copy of its report to DWR, on whose behalf Mr. Fryer would be preparing his report. (Ex. 1 at 10-11, 14). But that was obviously different from either side being able to include references to funding sources other than those or that had agreed to be included.

[7] Mr. Fryer said, at this point, that this was one of the "nuances" that he "had in mind" when he said a few moments earlier that he thought it should be the PAC members' choice whether they wanted to participate in the finalization of his report or not. (Ex. 1 at 10, 18).

"burden[ing]" or "bother[ing]" the respective parties for whom they were preparing their reports. That is, DRW "wouldn't be bothered by AWE" seeking "input, advice, and all that," and Mr. Fryer wasn't going to contact PAC members seeking "input, advice, everything else." (Ex. 1 at 17-18).

Mr. Fryer's counsel never suggested that the agreement permitted Mr. Fryer to contact the PAC members to secure their permission for Mr. Fryer's report to reference them. And if he could not do that, it would seem he could not unilaterally include references to them in his report, thereby suggesting their endorsement of it.[8] It was agreed that Mr. Fryer would not solicit any of the PAC members to seek their participation in his report for DWR. Instead, AWE would inform the PAC members that the litigation had been settled, and that if they wanted to be associated with Mr. Fryer's report they were free to do so. (Ex. 1 at 12-13, 18-19).

And with the articulation of the material terms of the agreement completed, and the parties having consented to jurisdiction here, 28 U.S.C. §636(b)(1)(c), the day ended. (Dkt. 26).

**B.**

The parties then began the process of preparing the written agreement contemplated by the March 13th agreement. On March 18, 2014, AWE's counsel forwarded to Mr. Fryer's counsel a draft "Settlement Agreement and Mutual Release of All Claims." [*See* Dkt.34, Ex. 2]. Paragraph 1 of the draft corresponded with "point 1" of the parties' discussions and agreement on March13 relating to the parties' overall design to "go their separate ways" and prepare separate reports for their respective contingencies.

---

[8] Mr. Fryer now claims that acknowledgment of the PAC members would affect the credibility of the report. See Opposition to Motion To Enforce Settlement Agreement at 8 [Dkt. 37].

By April 16, 2014, the parties had reached agreement on most, if not all but one of the provisions. In order to the resolve that issue, the parties met with me in chambers. The clause at issue was ¶2.0, which dealt with how AWE could use the information being provided by Mr. Fryer so that there would be no arguable copyright infringement. The clause was redrafted in chambers by the parties and the court to everyone's express satisfaction and explicitly agreed on. *See* n.16 *infra.* The conference concluded with the parties representing that there were no other unresolved issues with the written settlement agreement as it then existed, and that the parties expected to submit an order of dismissal shortly. [9]

Drafts of the written agreement were exchanged with changes to various paragraphs, but none to ¶1.0, which dealt with references by each party to the other and to the funding sources. [*See, e.g.,* Ex. 4, 5, 6, 7]. Then, on April 21st, pursuant to discussions and agreements reached at April 16, 2014 conference, Mr. Fryer provided AWE with his "draft final report for the AWE settlement" so that AWE had a reference point when complying with paragraph 2.0 of the draft settlement agreement regarding use of data in that report and copyright issues that had been agreed to in the April 16th conference with the court. The draft report referenced the PAC funding sources. This, AWE asserted, was in contravention of the parties' agreement memorialized in paragraph 1.0 of the

---

[9] On April 18, Mr. Fryer's counsel sent an email to AWE's counsel with Fryer's comments on the April 16, 2014 revised written agreement. (*See* Dkt 34,Ex.6). Mr. Fryer only identified two issues, neither of which mentioned any issue with paragraph 1.0. He merely requested changes to paragraphs 7.0 and 9.0 and stated, "with these changes, we are done." In response, AWE's counsel sent an email to Fryer's counsel agreeing to the issues raised with respect to paragraph 7.0. With respect to paragraph 9.0, AWE's counsel proposed that instead of specifically excluding Dr. Bamezai from the release – as Fryer had suggested – or including him in the release – as AWE initially suggested – the parties would leave Dr. Bamezai out of the release. AWE requested that Fryer add in his proposed language to paragraph 7.0, sign the Settlement Agreement and return it to AWE's counsel. (See Dkt. 34, Exhibit 7).

draft settlement agreement and implicit in the March 13th agreement. AWE's counsel sent an email to Mr. Fryer's counsel insisting that he remove any references to the PAC funding sources and Dr. Bamezai in any final version of the Report that he intended to publish. ( See Dkt. 34, Exhibit 8).

On April 23, 2014, in an effort to get the draft settlement agreement executed, AWE provided Fryer with another draft that included Mr. Fryer's proposed language in paragraph 7.0 and slightly revised language in paragraph 10.0 to more accurately reflect the agreement of having copyright claims remain viable if paragraph 2.0 were violated. [*See* Dkt. 34, Ex. 9].[10] This draft reflected what had been read into the record on March 13, 2014 as well as all the subsequent agreements, including, but not limited to, the results of the April 16, 2014 conference, that were necessary due to what Mr. Fryer has called the "nuances" that developed.

Mr. Fryer refused to remove from his report the references to AWE"s funding sources and on April 29, 2014, contended that the text of ¶ 1.0 of the draft settlement agreement did not require him to do so. He claimed that it was his choice whether to include or exclude them. [Dkt.34, Motion to Enforce Settlement Agreement at 8, ¶19; Opposition To Motion, Dkt 37, Ex. D]. As to AWE, this was in direct contravention of the explicit agreement reached on March 13. Moreover, despite exchanging repeated versions of the Settlement Agreement over the past month and a half that contained without change the same language in paragraph 1.0, Mr. Fryer had not previously contended that it empowered him to refer to AWE or the PAC members in his report for DWR if he chose to do so.

---

[10] A new paragraph 4.3 was also added to this version of the Settlement Agreement, which AWE contends was agreed to at the April 16, 2016 settlement conference, but Fryer objected to this paragraph. In an effort to compromise so that the Settlement Agreement would be signed, AWE subsequently agreed to remove this sub-paragraph.

Despite ongoing discussions with Mr. Fryer and his counsel, AWE was unable to reach a resolution with Mr. Fryer on ¶1.0 because he insisted that there was nothing in the transcript of the March 13th conference that *explicitly* prohibited him from referring in his report to the PAC members.[11] His position was that the draft settlement agreement, including the language in ¶2.0 that was drafted with the court's assistance and which he unquestionably agreed to, was of no effect, and the parties must therefore revert back to the transcript from March 13, 2013 as the agreement. AWE took the position that having agreed to all of the terms of the last version of the agreement drafted after the conclusion of the April 16, 2014 conference, although unsigned, should be enforced as the parties' binding settlement agreement since its terms had each been agreed to.

Thereafter, the parties had two separate follow-up telephone conferences with the court: the first on May 15, 2014 and the second on May 23rd. They were unsuccessful in resolving the parties' disputes. As discussed more fully below, Mr. Fryer's interpretation of ¶ 1 of the written and of the agreement reached on March 13th would lead to an anomalous result. In addition to the Project Advisory Committee members sponsoring AWE's report, they would also be shown on Mr. Fryer's report as having some sponsorship role in the report, with at least the appearance of approval of its methodology, and results.

Despite ongoing discussions with Mr. Fryer and his counsel, AWE was unable to reach a resolution with Mr. Fryer on ¶1.0. His position ultimately was that the draft settlement agreement, including the agreed language in ¶ 2.0 was of no effect, and that the parties must revert back to the

---

[11] AWE was especially sensitive to Mr. Fryer's referring in his report to the Walton Family Foundation, which had provided a grant to AWE for the Project. A reference to the Foundation in Mr. Fryer's report obviously would be – or at least could be – construed as the Foundation having provided funding *to Mr. Fryer* and/or as an endorsement of his report.

transcript from March 13, 2013. AWE took the position that having agreed to all of the terms of the draft written agreement, Mr. Fryer was bound by them, and that the written settlement agreement that was memorialized after the conclusion of the April 16, 2014 conference, although unsigned, should be enforced as the parties' binding settlement agreement since its separate terms had each been agreed to.

## ANALYSIS

### A.

### The Principles of Contract Interpretation Applicable To This Case

Settlement agreements—whether an oral or written—are contracts, and their construction and enforcement are governed by basic contract principles, *Gutta v. Standard Select Trust Insurance Plans,* 530 F.3d 614, 617 (7th Cir.2008); *Wilson v. Wilson,* 46 F.3d 660, 666 (7th Cir.1995), under applicable state contract law. *Dillard v. Starcon International, Inc.,* 483 F.3d 502, 507 (7th Cir. 2007). For a settlement agreement to be enforceable under Illinois contract law, which governs here, there must be an offer, acceptance, and a "meeting of the minds" as to the material terms of the agreement. *Petrich v. MCY Music World, Inc.,* 371 Ill.App.3d 332, 345, 862 N.E.2d 1171 (1st Dist.2007).

Although the cases often use the phrase, "meeting of the minds," as a handy shorthand, the language is misleading if taken literally. *See Laserage Technology Corp. v. Laserage Laboratories, Inc.,* 972 F.2d 799, 802 (7th Cir.1992)."The law has nothing to do with the actual state of the parties' minds. In contract, as elsewhere, it must go by externals, and judge parties by their conduct."

Holmes, The Common Law, 242 (1881) (Howe ed., Harvard University Press 1963).[12] A contracting party cannot expect that the other party will "peek into" the other's "mind and discover" that it had a different view of the terms than stated in the contract. *Aeroground, Inc. v. CenterPoint Properties Trust,* 738 F.3d 810, 813 (7th Cir.2013). *See ConFold Pacific, Inc. v. Polaris Ind.,* 433 F.3d 952 (7th Cir.2006); *Skycom Corp. v. Telstar Corp.,* 813 F.2d 810, 814 (7th Cir.1987). Thus, the inquiry will focus not on the question of whether the subjective minds of the parties have met, but on their outward expression of assent as evidenced by the language used, the contract's purpose, and all of the relevant circumstances surrounding the contract's formation. *See Winforge, Inc. v. Coachmen Industries, Inc.,* 691 F.3d 856, 875 (7th Cir. 2012); *Rain v. Rolls-Royce Corp.*, 626 F.3d 372, 382 (7th Cir. 2010); *Hampton v. Ford Motor Co.*, 561 F.3d 709, 714 (7th Cir. 2009); *Sally Beauty Co., Inc. v. Nexxus Products Co., Inc.*, 801 F.2d 1001, 1004 (7th Cir.1986); E. Allan Farnsworth, Farnsworth on Contracts, §7.10 at 287 (3rd ed. 2004).

"But a contract includes, not only the promises set forth in express words, but, in addition, all such implied provisions as are indispensable to effectuate the intention of the parties and as arise from the language of the contract and the circumstances under which it was made." *Sacramento Navigation Co. v. Salz,* 273 U.S. 326, 329 (1927). *See also Delaware & Hudson Canal Co. v. Pennsylvania Coal Co.,* 75 U.S. 276, 288-289 (1868). Phrased differently, the binding terms of a contract include implied as well as express terms. *United States v. Barnett*, 415 F.3d 690 (7th Cir. 2005)(Posner, J.)("contracts...contain implicit as well as explicit terms...[e]specially implicit terms necessary to head off absurdities."); *Phelps Dodge Corp. v. Schumacher Elec. Corp.*, 415 F.3d 655

---

[12] *See also,* Holmes*, The Path of the Law,* 10 Harv.L.Rev. 457, 464 (1897); Holmes, *The Theory of Legal Interpretation,* 12 Harv.L.Rev. 417 (1899).

(7th Cir. 2005)(Posner, J.); *In re Doctors Hosp. of Hyde Park, Inc*. 337 F.3d 951, 957 (7th Cir.2003).

*See also* Farnsworth on Contracts, *supra* §7.16 at 349.[13]

As the Second Circuit has carefully explained:

Under "general principles of contract law," a failure to locate explicit contractual language does not mark the end of proper judicial interpretation and construction. Contracting parties often express their agreements imprecisely or incompletely. In such cases, if the interpreting court can discern from the contract as a whole what the parties "must have intended," it should enforce that intention despite a lack of express terminology. *See* 11 Richard A. Lord, *Williston on Contracts* § 31:7, at 321 (4th ed. 1999) ("It should be noted that terms are to be implied in contract, not because they are reasonable, but because they are necessarily involved in the contractual relationship, such that the parties must have intended them and must have failed to express them only because of sheer inadvertence or because they are too obvious to need expression. In this connection, it has been said that most contracts include implied conditions that are indispensable in effectuating the intentions of the parties."); ... *See also Restatement (Second) of Contracts* § 204 & cmt. b, at 96–97 (1981) (stating that if the parties "fail to foresee the situation which later arises," or fail to manifest their intentions "because the situation seems to be unimportant or unlikely, or because discussion of it might be unpleasant or might produce delay or impasse," the court may supply a term "which is reasonable in the circumstances.").

*Dobson v. Hartford Financial Services Group, Inc*. 389 F.3d 386, 399 (2nd Cir.2004).[14]

---

[13] Professor Farnsworth has put it this way:

Once the court has determined through interpretation that it is faced with an omitted case, it must supply a term to deal with that case. The process by which a court supplies a term is commonly called 'implication' and the resulting term is called an 'implied term.' (Such terms are also called 'implied-in-law' terms to distinguish them from "implied-in-fact" terms, which are derived from the behavior of the parties and are treated in the same way as 'express' terms). (Citations omitted)(parentheses in original).

[14] This is the theory on which the motion is based in regard to the argument that Mr. Fryer agreed to remove all funding sources from his report other than DRW. *See* Dkt.34, Motion at 12, ¶27 ("[T]he agreement read into the record... on March 13, 2014 necessarily included Fryer's agreement not to reference funding sources other than DWR in his Report. ... Implicit in this agreement was the understanding that Fryer would not then reference the PAC funding sources as supporting or participating in his report. Nor would AWE reference DWR as supporting or participating in its report.")

One of the Seventh Circuit's favorite themes is that "'[c]ommon sense is as much a part of contract interpretation as is the dictionary or the arsenal of canons.'" *Dispatch Automation, Inc. v. Richards,* 280 F.3d 1116, 1119 (7th Cir.2002). *See also, Miller v. St. Paul Mercury Ins. Co.* 683 F.3d 871, 874 (7th Cir.2012)("As we explain below, we can use common sense and the usual tools of contract interpretation to interpret the language in this policy without relying on the rule of ambiguity."); *McElroy v. B.F. Goodrich Co.,* 73 F.3d 722, 726–27 (7th Cir.2002); *Vendetti v. Compass Environmental, Inc.,* 559 F.3d 731, 733 (7th Cir.2009); *United States v. Barnett,* 415 F.3d 690 (7th Cir.2005) ("'there is no novelty in interpreting contractual language in light of common sense.' "); *Beanstalk Group. Inc. v. AM General Corn.,* 283 F.3d 856 (7th Cir. 2002) (Posner, J.). (discussing the mischief that results from abandonment of common sense in contract interpretation). These are principles to which the Supreme Court subscribes as well. *See e.g. US Airways, Inc. v. McCutchen,* 133 S.Ct. 1537, 1549 (2013)("'[C]ontracts... are enacted against a background of common-sense understandings and legal principles that the parties may not have bothered to incorporate expressly but that operate as default rules to govern in the absence of a clear expression of the parties' [contrary] intent. .... Indeed, ignoring those rules is likely to frustrate the parties' intent and produce perverse consequences.").

**B.**

**Other Than The Reference to DWR, Mr. Fryer Agreed To Remove All References To Funding Sources From His Report**

Mr. Fryer's contention that it was never part of the March settlement agreement that he remove all references to PAC members from the Report that he was preparing solely for DWR is mistaken. Under the circumstances of this case, necessarily implicit in the terms of the agreement

placed on the record was a promise by each side that their respective reports would contain no reference to each other or their respective funding sources – absent some expressed desire by those funding sources to participate in the report. Indeed, it is contrary to common sense to suggest that in light of the circumstances that gave rise to the litigation and in view of each side's agreement to make no reference to the other in the separate reports being prepared for their separate funding sources, agreeing to go their separate ways, and agreeing that Mr. Fryer could not solicit PAC members to be involved in his report, Mr. Fryer was free nonetheless to make reference to AWE's funding sources (i.e. the PAC members) in his report.

To any reader, that reference would appear to be an endorsement of the report by the PAC members, or at least, that would certainly be a distinct and reasonable inference. Yet, as the Complaint charged, it was the PAC members' dissatisfaction with Mr. Fryer and concern over his report that prompted the lawsuit in the first place. Given this backdrop, acceptance of Mr. Fryer's thesis would defeat or frustrate the core purpose of the settlement.

That removing references to PAC members was a necessarily implied term of the March agreement is evidenced by the parties' subsequent conduct. The initial draft of the settlement agreement sent to Mr. Fryer on March 18, 2014 contained as ¶1.0 – the very first point on which the parties agreed at the March settlement conference – the obligations of the parties regarding their respective reports:

> 1.0 Fryer may complete his Report on behalf of DWR in any way he sees fit, and if he chooses to do so, will remove from his Report all references to: (1) AWE and its employees, including any reference to AWE or its employees in the Acknowledgment section of the Report; (2) Anil Bamezai, PhD ("Dr. Bamezai"); (3) all funding sources other than DWR, unless specifically provided with permission from the funding sources as described in paragraphs 1.1 and 1.2, below; and (4) peer reviewers Thomas Chesnutt and Peter Mayer. In addition, Fryer shall not use AWE's logo

anywhere on his Report.

1.1 Fryer will not contact or solicit opinions, input or advice of any kind from any of the funding sources, other than DWR, or any of the PAC members regarding the completion or any other aspect of his Report, unless directly contacted by the funding sources or PAC members;

1.2 AWE will notify all funding sources, other than DWR, and PAC members that a settlement has been reached in the Lawsuit, Fryer has the right to complete his Report on behalf of DWR and provide Fryer's contact information (phone number and email address) with instructions that if they are interested in discussing or being a part of Fryer's Report, they will need to contact him directly.

On March 20, 2014, Mr. Fryer's counsel provided AWE's counsel with a revised Settlement Agreement with Mr. Fryer's comments. [*See* Dkt.34, Ex. 3]. Other than removing the phrase, "unless specifically provided with permission from the funding sources as described in paragraphs 1.1 and 1.2 below," the language in ¶1.0 regarding Mr. Fryer's agreement not to reference funding sources other than DWR was the same. It remained the same throughout the April 14th version of the written agreement. [*See* Dkt.34, Ex. 4]. Mr. Fryer's brief contains no argument regarding the effect of the removal of this phrase might have on the interpretation of ¶1.0.

Under Mr. Fryer's reading of ¶1.0, (after the removal of ¶1.0(3)), he "may" complete his separate report for DWR as he sees fit, and, should that occur, if he "chooses to" remove references to AWE and its funding sources, he "will" remove them. This is an illogical and strained reading of the paragraph. In normal parlance, no one would say that if one "chooses" to do something, he "will" do it. If ¶1 were intended to give Mr. Fryer the option to refer to AWE and it funders in his report, it would have simply said that Mr. Fryer has the choice – or the option – of including references to AWE and its funders in his report  Mr. Fryer's interpretation is a strained and unnatural

use of language.[15]

But we need not rely on the awkward phraseology alone. Mr. Fryer's interpretation cannot mean what he says it means, because he explicitly agreed at the March settlement conference that he would not make any reference to AWE in his report for DWR. Indeed, even Mr. Fryer's Declaration in his brief admits he "agreed to take out references to AWE in [his] report and AWE agreed to take out references to [him] in its anticipated report." [Dkt 37-1]. Yet, under his interpretation of ¶1.0, he has the option to make reference in his report not only to AWE's funders but to AWE, itself. Paragraphs 1.1 and 1.2 are perfectly consistent with the March settlement agreement, and properly read, so too is ¶1.0.

Properly read, ¶1.0 merely means that if Mr. Fryer chooses to actually go ahead and prepare his report for DWR, he would remove from his report all references to AWE and to "all funding sources other than DWR." Thus, whether one views ¶1.0 as a new agreement or simply evidence of the parties' original intent the result is the same. Mr. Fryer agreed that if he actually went ahead and finalized his report for DWR he would not make reference to AWE or its funding sources, unless contacted by one or more of them and asked to participate in his report.

At no point prior to April 29, 2014, did Mr. Fryer ever object to the language in ¶1.0 (other than the subparagraph requiring specific permission from the funding sources) or assert that he did not agree it accurately reflected the parties' March agreement. And, during the conference on April 16th, Mr. Fryer never raised any issues or objections to paragraph 1.0, despite the fact that every other issue was carefully discussed.

---

[15] While ¶1.0 is scarcely a model of draftsmanship, its meaning is clear enough – especially given the circumstances of the litigation, which the cases say factor into contract interpretation. *See supra* at 12.

Even if one were to accept Mr. Fryer's current position that he genuinely believed that under the agreement he had the unqualified choice to include references to whomever he wanted, the objective theory of contracts makes his subjective intent irrelevant. Whether there is "meeting of the minds" is a determination based on an objective appraisal of the parties' conduct, not their subjective beliefs. *Paxton-Buckley-Loda Educ. Ass'n v. Ill. Educ. Labor Relations Bd.,* 304 Ill.App.3d 343, 350, 710 N.E.2d 538 (4th Dist.1999). The uncommunicated mental reservation on the part of one party is ineffectual and is not a valid reason for avoiding an otherwise binding agreement. *See Steinberg v. Chicago Medical School,* 69 Ill.2d 320, 330–331, 371 N.E.2d 634 (1977). We do not "take a tour through [a party's] cranium, with [the party] as the guide." *Skycom Corp. v. Telstar Corp.,* 813 F.2d 810, 814 (7th Cir.1987).

In short, in Illinois as in elsewhere, it is objective intent that governs, *Newkirk v. Village of Steger,* 536 F.3d 771, 774 (7th Cir. 2008). Thus, Mr. Fryer's Declaration in support of his opposition to AWE's motion to enforce the settlement agreement (Dkt. 37-1) cannot be used as evidence of what he originally intended. *Cf.,Empro Mfg. Co., Inc. v. Ball-Co Mfg., Inc.,* 870 F.2d 423, 425 (7th Cir.1989) and cases cited *supra* at 11.

The untenability of Mr. Fryer's construction of ¶1.0 is further supported by his agreement to the language in ¶1.1, which he does not contest, and which contained his promise not to "contact or solicit opinions, input or advice of any kind from any of the funding sources or any of the advisory group members, other than DWR, regarding the completion or any other aspect of his Report, unless first directly contacted by the funding sources or advisory group members." (*See, e.g.,* Dkt. Ex. 9, ¶1.1). AWE also agreed to do the same with respect to any DWR representative. (*See, e.g.,* Ex. 9, ¶2.1).

# C.

## The Dispute Regarding The Santa Rosa Data and Dr. Bamezai

There is an additional aspect to the parties' disagreement. It was agreed in the March settlement conference that Mr. Fryer would turn over to AWE "all utility data" that he utilized in preparing his draft report and that AWE could use that data in its report. Mr. Fryer was to provide a list of case study utilities which have confidentiality agreements and AWE would get releases from them. Once that was accomplished, Mr. Fryer was to turn over within 14 days "all utility data." (*See* Dkt. 34, Motion to Enforce Settlement Agreement, Ex. 1, Tr. 3-4).[16]

According to AWE, this aspect of the agreement was based on an understanding that Fryer had confidentiality agreements with all of the case utilities that provided data to the study. AWE's relationships with the case utilities was believed to be such that it could obtain the releases. (Dkt. 34, Motion to Enforce Settlement Agreement at 14). However, AWE states that as it turned out, Mr. Fryer did not have a confidentiality agreement with Santa Rosa, and therefore Santa Rosa was not willing to provide a release relieving Mr. Fryer of confidentiality obligations "from an agreement that did not exist." *Id.* As a result, AWE contends, the parties were forced to negotiate additional terms that could not have been a part of the record on March 13th based on the facts that were known at the time. *Id.* The parties did so by agreeing that the data would be provided to Dr. Bamezai. *Id.*

Dr. Anil Bamezai was referred to at the March settlement conference only once, on page 6 of the transcript, which reflects that AWE will be responsible for all future payments to Dr. Bamezai

---

[16] The conference with the court in April dealt with the implementation of that provision of the agreement so that the information could be used without fear of a claim by Mr. Fryer of copyright infringement. As noted, the provision of the drafts of the written settlement agreement dealing with this topic was drafted line-by-line by the parties and the court and was expressly agreed to by the parties in the court's presence. No one disputes these facts.

with the exception of $2,295 for which Mr. Fryer will be responsible. (Dkt. 34, Motion to Enforce Settlement Agreement, Ex. 1, Tr. 6).  According to AWE, the language in the draft settlement agreement relating to Dr. Bamezai was drafted by Mr. Fryer's counsel and further confirmed when he asked for Dr. Bamezai's address so he could send the utility data.  (Dkt. 34, Motion to Enforce Settlement Agreement at 14).[17]

Mr. Fryer's rejoinder is that while the court can enforce the terms of the March 13th settlement agreement, "it cannot add to those terms based on the negotiations for a written contract or tentative agreements reached during those negotiations... [A]ny modification of [the] terms [of the March 13th agreement] in a written agreement depended on the parties' execution of a final written document." (Dkt. 37, Opposition to Motion to Enforce Settlement Agreement and Cross-Motion to Enforce Settlement Agreement at 9).  Mr. Fryer's brief relies on *PFT Roberson's* statement that parties may reach agreement in stages without taking the risk that courts will enforce a partial bargain that one side or the other would have rejected as incomplete. *Id.*

But the present case is not what *PFT Roberson* had in mind. This was not some initial set of negotiations involving separate terms that was proceeding "in stages" in advance of actual contract formation.  Here, the parties already had an admittedly binding agreement and were attempting merely to memorialize that agreement.[18]  While it was unquestionably a part of the March settlement

---

[17]  The April 14th email from Mr. Fryer's counsel stated that "most issues have been resolved" and then gave Mr. Fryer's position on the data issue. He said that "Mr. Fryer will provide the full data (Santa Rose and others) to Dr. Bazemai.... This should resolve AWE's inability to get a release (or equivalent) from Santa Rose and allow all the data to be used by Dr. Bamezai for AWE's report. Since Dr. Bamezai will be sent all the data files Mr. Fryer is providing, it will not be necessary to carve out Santa Rosa from the data sets." (Dkt. 34, Motion to Enforce Settlement Agreement, Ex. 4).

[18] One could certainly argue that the unquestioned agreement reached that day was unnecessary since the March 13th agreement specifically allowed AWE to use the data Mr. Fryer was obligated to provide. But

(continued...)

agreement that all the utility data – including that from Santa Rosa – would be provided by Mr. Fryer to AWE for use in its report, an unexpected issue arose regarding the unavailability of a release for the information from Santa Rosa. AWE contends that since Santa Rosa had no confidentiality agreements there was no need for a release of its data. Mr. Fryer apparently had concerns. The parties worked out an agreement to cover this unexpected event. There is no legitimate reason why the agreed upon implementation of that aspect of the March 13th agreement ought not be enforced.

Mr. Fryer argues that even "assuming that the course of negotiations could make piecemeal modifications to the March 13th agreement, those modifications would require new consideration." (Dkt. 27, Opposition to Motion to Enforce Settlement Agreement at 13). Mr. Fryer says there was none. But that argument is mistaken. Consideration as often as not takes the form of mutual promises. *Burke v. 401 N. Wabash Venture, LLC*, 714 F.3d 501, 507 (7th Cir. 2013). That is what occurred here in connection with the Santa Rosa release and in connection with the drafting of ¶2.0, which dealt with the manner in which AWE's report could reproduce information contained in Mr. Fryer's report.[19]

---

[18](...continued)
lawyers are in the business of acting prophylactically on behalf of clients.

[19] Paragraph 2.0 provided that:

The parties agree that A WE may prepare a report based on the data collected for the Project for the remaining funding sources, excluding DWR unless DWR consents to participate pursuant to paragraph 2.1 below, in any way it sees fit. The parties agree that AWE shall not utilize in whole or in part the exact language used in Fryer's Report. The cover page, graphs and charts used in AWE's report will use different colors from the cover page, graphs and charts used in Fryer's Report. The parties agree that the data used in the graphs, charts, conclusions and analyses to be used in the AWE rep011 may be the same as in Fryer's report. The parties agree that AWE's report may use or arrive at the same conclusions reached in Fryer's Report and/or use the same organizational format as Fryer's Report. The parties agree that AWE may use the same rationale or methodology used in Fryer's Report

(continued...)

One issue that continues to divide the parties deals with designating Dr. Bamezai as an agent. It created problems because the releases included AWE and its agents, and Mr. Fryer was unwilling to release Dr. Bamezai. This is an issue that was not part of the March 13th settlement agreement and the parties have never been able to resolve it. Hence, Mr. Fryer has the better of the argument n this issue.

### D.

Where then does this leave us? Mr. Fryer says we must scrap all of the effort put into memorializing the terms of the March agreement even though the evidence is clear that the parties had expressly agreed on the language of most of the points by the time of the last draft of the written agreement. These included the question of references by the parties to each other and their respective funders in ¶1, the copyright issues in ¶ 2.0, and numerous other issues about which there was no dispute. Mr. Fryer has a different take on the matter.

While he does not dispute that agreements as to specific memorializations of the terms of the March agreement were reached, he contends that none of those agreements are binding because there was never a signed final document. (Dkt. 37, Opposition to Motion to Enforce Settlement and Cross Motion to Enforce Settlement at 10-11). He bases his argument for the necessity of a signed, written agreement as a precondition to the enforceability of any of the agreed upon terms on a claimed interrelationship between seven separate provisions of the contract, which he says require that result when read together. (*See* Dkt. 37, Opposition to Enforce Settlement and Cross Motion to Enforce

---

[19](...continued)
in reaching its conclusions. The parties agree that Dr. Anil Bamezai will be preparing the AWE Report on behalf of and as agent of AWE. Accordingly, the directives outlined in this paragraph 2.0 with regard to AWE's Report extend to any and all work performed by Dr. Bamezai in preparing the AWE report.

Settlement at 10-11). But beyond merely citing these provisions, Mr. Fryer's brief contains no supported argument for his conclusion.

As noted earlier, this was not a case in which parties to a possible contract were negotiating in stages. In that context, parties may reach agreement on elements A, B and C, with more negotiation required on D and E without having bound themselves to an enforceable agreement on A, B and C if they cannot agree on D and E. *See PFT Roberson, supra.* Rather, this is a case in which the parties had already come to an admittedly enforceable and binding agreement on March 13th, and their subsequent efforts were directed towards memorializing that agreement. Where there is no dispute about the provisions of the draft settlement on which the parties indisputably agreed, they should be enforced as they are nothing more than the articulation of the terms agreed to at the March 13th conference.

As to the question of the scope of the releases, there appears to be a continuing dispute regarding Dr. Bamezai. Mr. Fryer has refused to release Dr. Bamezai because he has other matters that he will not release and the language of Mr. Fryer's release would, according to his interpretation, release Dr. Bamezai. The issue of a release of Dr. Bamezai was never part of the March 13th agreement.

Finally, there is the matter of the Santa Rosa data. Beyond the requirement that Mr. Fryer was to turn over all utility data – which would include Santa Rosa – and that AWE would obtain necessary releases from the utilities, this matter was not discussed further at the March settlement conference. According to Mr. Fryer's brief, Dr. Bamezai, as a researcher for the Santa Rosa case study, was within the scope of the release but also personally bound like Mr. Fryer to guard the confidentiality of the data. As a compromise to address AWE's inability to get a release from Santa

Rosa – Mr. Fryer calls this "AWE's failure," while AWE contends there was no need for any release since there was no confidentiality agreement – the parties jointly proposed providing the Santa Rosa data to Dr. Bamezai as a co-researcher with the obligation of confidentiality. (Dkt. 37 at 12-13).

However, AWE insisted on language that Mr. Fryer objected to "as it implied that he was agreeing that Bamezai had the discretion to disclose Santa Rosa confidentiality data to AWE." It is unclear as to the meaning of this dispute. But it does appear that there was not an agreement on turnover of the data to Dr. Bamezai and the briefs leave the reader somewhat at large with what this all means and why Mr. Fryer cannot simply turn over the Santa Rosa data if, in fact, he had no agreement of confidentiality with Santa Rosa as AWE contends.

There was no discussion about this at the March settlement conference. The fact remains that in the ensuing memorialization process, the parties could not agree on using Dr. Bamezai as a conduit to convey the information. (Dkt. 37 at 12-13).

To the extent AWE has not complied with its notification obligations to the PAC members, (Dkt. 37, Cross Motion To enforce Settlement Agreement, at 14), it must do so.

## CONCLUSION

Plaintiff's Motion to Enforce Settlement Agreement [Dkt. 34] is granted in part and denied in part, as is the defendant's Cross Motion to Enforce Settlement Agreement. [Dkt. 37]. The most troublesome and conspicuous issue, notwithstanding the briefs' laconic treatment of the issue, involves the turnover of the Santa Rosa data. These were not matters that were the focus of the conference with the parties on April 16th and the subsequent telephone conferences in May. These

are matters that require further explication and the case is set for further status and discussion on October 29, 2014 at 9:15 a.m.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 10/22/14