**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ALLIANCE FOR WATER EFFICIENCY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 14 C 115** |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **JAMES FRYER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

**INTRODUCTION**

The history of this case is summarized in *Alliance for Water Efficiency v. Fryer*, 808 F.3d 1153 (7th Cir. 2015)[Dkt. #89], which reversed this court's decision in *Alliance for Water Efficiency v. Fryer*, 2015 WL 102166 (N.D.Ill. 2015)[Dkt. #50]. It is further discussed below and in the companion Memorandum Opinion and Order dealing with Mr. Fryer's motion for attorneys' fees. *See Alliance for Water Efficiency v. Fryer*, _ WL _ (N.D.Ill. 2017). [Dkt. #115].[1]

The Final Judgment of the Court of Appeals was issued the same day as the Seventh Circuit's Opinion and was docketed as the Mandate on January 13, 2016. [Dkt. #88]. *See also* Rule 41(a), Federal Rules of Appellate Procedure. The Mandate provided that the Judgment of the District Court was reversed, "with costs [which were specified in the Mandate], in accordance with the decision of [the Seventh Circuit]...." [Dkt. #88]. *See also* Dkt. #87.

---

[1] Dkt. #115 is the number assigned to the Opinion dealing with Mr. Fryer's Motion for Fees. [Dkt. #94]. Dkt. #116 will be assigned to this Opinion.

# I.
## PROCEDURAL HISTORY OF THE CASE

Mr. Fryer has filed a "Motion For Restitution Following Reversal On Appeal." [Dkt. #96]. The motion claims that upon reversal of a judgment "the right to restitution is well established." [Dkt. 96 at 3, ¶11]. Indeed, it insists that under established Supreme Court precedent, "restitution may be obtained in the main action itself without filing a new lawsuit." *Id.* at ¶11. It goes on to say that because of the Seventh Circuit's having vacated this court's injunction – "because it contains terms on which the parties ha[d] not agreed," 808 F.3d at 1157 – the Alliance has been "unjustly enriched" in the amount computed by Mr. Fryer of $133,817.30. [Dkt. #96 at 4, ¶12].

This amount is made up of (1) $26,855.03 which Mr. Fryer says is the claimed value of the so called Santa Rosa data. Mr. Fryer claims he was required to turn over that data to the Alliance – even though the Seventh Circuit made clear that "no such requirement appears in the injunction [that satisfies F.R.C.P. 65(d)(1)] or in any judgment satisfying Fed.R.Civ.P. 58." *Alliance for Water Efficiency*, 808 F. 3d 1157; (2) $105,807.50 as recompense for the benefit the Alliance supposedly received – according to Mr. Fryer's estimate – by publishing its report first, even though the settlement agreement did not prescribe the order of publication; (3) $1,154.77 in claimed interest for the Alliance's supposed delay in paying Mr. Fryer the settlement amount for his past efforts on the project, and; (4) an injunction ordering the Alliance to destroy all digital and hard copies of its separate report – which Mr. Fryer agreed in the settlement agreement the Alliance could prepare and publish – and to cease any use of any report containing the Santa Rosa data.

The Alliance asserts that Mr. Fryer is attempting to "undo the terms of the settlement agreement," and that under the "guise of restitution after reversal on appeal, [he] is now seeking additional compensation because the Alliance did precisely what Fryer agreed to do in the settlement

agreement, namely the publication by the Alliance of its own report and the right to use in that report

the data that had been already been collected." The Alliance concludes that because "Fryer did not

confer any benefit on [the Alliance] or have his property taken as a result of the judgment reversed

on appeal he has no legal basis for restitution damages." [Dkt. #101 at 1].

As the Supreme Court stressed in *US Airways, Inc. v. McCutchen*, _U.S._, 133 S.Ct. 1537,

1546–47 (2013), quoting the Restatement (Third) of Restitution and Unjust Enrichment (2011): "'A

valid contract defines the obligations of the parties as to matters within its scope, displacing to that

extent any inquiry into unjust enrichment.'" In those circumstances, hewing to the parties' exchange

yields "appropriate" as well as "equitable" relief. That observation applies here with singular force.

## II.
## RESTITUTION

### A.

The case law concerning claims for restitution following a reversal on appeal is perhaps less

than clear despite the long period in which restitution has been an accepted remedy. *See* Restatement

(Third) of Restitution and Unjust Enrichment (2011); Dan B. Dobbs, Remedies, 222 - *et seq.* (West

Publishing Co. 1973)("restoration is a simple word but a difficult subject").[2] It is a long established

principle "that a party against whom an erroneous judgment or decree has been carried into effect

is entitled, in the event of a reversal, to be restored by his adversary to that which he has lost

thereby." *Arkadelphia Milling Co. v. St. Louis Sw. Ry. Co.*, 249 U.S. 134, 145 (1919); *Reed v. Allen*,

---

[2] Restitution has been called "freestanding," which can "'arise in a bedazzling variety of situations.'" Some have concluded that restitution "is not a remedy but a cause of action," while others question this conclusion. *See generally* Douglas L. Johnson, *What happened to Unjust Enrichment in California: The Deterioration of Equity in the California Courts*, 44 Loy.L.A.L.Rev. 277 (2010); Candace Saarikovacie-Fleischeral, *Teaching Restitution*, 39 Brandeis L.J. 657 (2001).

286 U.S. 191, 203 (1932); *Wyatt v. Syrian Arab Republic*, 800 F.3d 331, 340 (7th Cir. 2015); *Gould*

*v. Hiram Walker & Sons, Inc.*, 266 F.2d 249, 253 (7th Cir. 1959).

It is generally conceded that a restitution claim is not aimed at compensating the plaintiff so

much as forcing the defendant to give up benefits that it would be unjust for him to keep. Indeed,

"[i]t is now universally recognized that the principle central to all restitution awards is the principle

against unjust enrichment...." Dobbs, *supra* at 229. The American Law Institute notes in Restatement

Third, Restitution and Unjust Enrichment § 1(b) (2011): "[u]njust enrichment" is a term of art. The

substantive part of the law of restitution is concerned with identifying those forms of enrichment that

the law treats as 'unjust' for the purposes of imposing liability .... Unjust[] enrichment is enrichment

that lacks an adequate legal basis. Unjust enrichment is a necessary element or precondition of the

larger claim of restitution. The restitutionary claim affirmatively seeks the return of the benefit for

which it would be unconscionable for the defendant to retain." Roy L. Brooks, *Postconflict Justice*

*in the Aftermath of Modern Slavery*, 46 Geo. Wash. Int'l L. Rev. 243 (2014). And as used in the

Restatement, the terms restitution and unjust enrichment will often be treated as synonymous. Any

more particular meaning that the words may carry should be clear from the context.[3]

But, the proper procedure in restitution cases is, perhaps, not so well established. In *Reed*,

---

[3] The Seventh Circuit has said: "'In its substantive sense, unjust enrichment or restitution refers primarily to situations in which either the defendant has received something that of right belongs to the plaintiff (for example, he received it by mistake—or he stole it), or the plaintiff had rendered a service to the defendant in circumstances in which one would reasonably expect to be paid (and the defendant refused to pay) though for a good reason there was no contract.'" *Thomas v. UBS AG*, 706 F.3d 846, 853–54 (7th Cir. 2013)(parenthesis in original). And in *Schlueter v. Latek*, 683 F.3d 350, 353 (7th Cir.2012), the court said: "Restitution and damages are different remedies. Damages are measured by the plaintiff's loss, restitution by the defendant's gain." *See also Wilder Corp. of Delaware v. Thompson Drainage and Levee Dist.*, 658 F.3d 802, 807 (7th Cir.2011); *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011)("Unjust enrichment is a common-law theory of recovery or restitution that arises when the defendant is retaining a benefit to the plaintiff's detriment, and this retention is unjust.").

the Supreme Court held that restitution was a remedy and listed more than one possible avenue for

a litigant seeking relief to follow:

> Two remedies exist, *the one by summary motion addressed to the appellate court, the other by a plenary suit.* The books show that it has long been the practice to embody in the mandate of reversal a direction that the plaintiff in error 'be restored to all things which he hath lost by occasion of the said judgment. What this was might be ascertained through an order to show cause known as a *scire facias quare restitutionem habere non debet.* Inquiry was then made whether anything had been taken 'by colour of the judgment,' with an appropriate mandate for the return of anything discovered. *On the other hand, the litigant who has prevailed on the appeal is not confined to a motion for summary relief. He may elect to maintain an action, or the court in its discretion may remit him to that remedy.* One form of remedy or the other, however, is granted as of right. The remedy in its essence like the one for money had and received is for the recovery of benefits that in good conscience may no longer be retained. 'It is one of the equitable powers, inherent in every court of justice *so long as it retains control of the subject-matter and of the parties*, to correct that which has been wrongfully done by virtue of its process.'

286 U.S. at 203-04. (Emphasis supplied). *See also Mathis v. DCR Mortg. Ill. Sub, I , LLC*, 952

F.Supp.2d 828, 834 (W.D.Tex. 2013); *United States v. Fleet National Bank*, 288 B.R. 167 (D.Mass.

2002).

Mr. Fryer did not directly ask the Seventh Circuit for a restitution order. He asked it to

instruct the district court to award him interest due to what he characterizes as the Alliance's late

payment of $25,000 under the March 13th settlement agreement for past work on the project. The

Court of Appeals did not grant that request; it simply vacated the injunction and reversed without

remand. In the absence of a remand from the Court of Appeals, there is a question whether a district

court retains the authority to grant restitution in the same case. In *Arkadelphia Milling*, the Supreme

Court conditioned the power of the district court upon "retain[ing] control of the subject-matter and

of the parties . . . ." 249 U.S. at 146; *see also Northwestern Fuel Co. v. Brock*, 139 U.S. 216, 219

(1891)("the power is inherent in every court, while the subject of controversy is in its custody, *and*

*the parties are before it*, to undo what it had no authority to do originally, and in which it, therefore, acted erroneously, and to restore, so far as possible, the parties to their former position. Jurisdiction to correct what had been wrongfully done must remain with the court *so long as the parties and the case are properly before it*, either in the first instance *or when remanded* to it by an appellate tribunal.")(emphasis supplied); *Wyatt*, 800 F.3d at 331(noting that some case law suggested that the proper avenue for a claim for restitution was a new suit in the proper court).

Of course, once Mr. Fryer appealed, the district court was divested of jurisdiction at least for most purposes. *See Griggs v. Provident Consumer Discount Co.,* 459 U.S. 56, 58 (1982)("The filing of a notice of appeal is an event of jurisdictional significance – it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."); *Wyatt*, 800 F.3d at 341. Mr. Fryer does not address the question of whether, after the reversal without a remand, a lower court can grant restitution. But there is authority that a district court has such power. *See United States v. Kellington*, 217 F.3d 1084, 1094 n. 11 (9th Cir. 2000)(collecting cases); *Caldwell v. Puget Sound Elec. Apprenticeship & Training Trust*, 824 F.2d 765, 766-68 (9th Cir. 1987).[4] *And see* the discussion in *Educ. Media Co. at Virginia Tech v. Insley*, , 2014 WL 3812359, at *1 (E.D. Va. 2014); *Glaberson v. Comcast Corp.*, 295 F.R.D. 95, 102 (E.D. Pa. 2013). The rule of mandate would not appear to bar consideration of these issues (with the exception of that discussed *infra* at 24).

---

[4] The Ninth Circuit noted that the subject of the controversy and the parties were properly before the district court, because "the mandate of the court of appeals, once issued, returns to the district court." It cited the first Restatement on Restitution § 74 at 303 (1937) for the proposition that "the tribunal which is reversed can on motion or on its own initiative direct that restitution be made" *Caldwel*l, 824 F.2d at 767.

**B.**

"[E]quitable remedies are a special blend of what is necessary, what is fair, and what is workable. . . ." *Lemon v. Kurtzman*, 411 U.S. 182, 200 (1973). Restitution is often called an equitable remedy and calls for a court to exercise discretion in determining whether restitution is proper and, if so, how much should be awarded. *Porter v. Warner Holding Co.*, 328 U.S. 395, 400 (1946). An order of restitution will be upset only if the district court used inappropriate factors or did not exercise discretion at all. *United States v. Frith*, 461 F.3d 914, 919 (7th Cir.2006). Discretion, it must be remembered, denotes the absence of a hard and fast rule. *Langnes v. Green*, 282 U.S. 531, 541 (1931); *United States v. Davis*, 202 F.2d 621, 624–25 (7th Cir.1953). And while it may not be exercised arbitrarily, it allows for two decision makers to reach opposite conclusions on virtually identical sets of facts. *See Mejia v. Cook County, Ill.*, 650 F.3d 631, 635 (7th Cir. 2011); *United States v. Banks*, 546 F.3d 507, 508 (7th Cir. 2008). *See also McCleskey v. Kemp*, 753 F.2d 877, 891 (5th Cir. 1985)("'The very exercise of discretion means that persons exercising discretion may reach different results from exact duplicates."), *aff'd., McCleskey v. Kemp*, 481 U.S. 279, 289-290 (1987). These principles, when applied to the facts of this case, counsel that the motion for restitution be denied.

**C.**
**The Santa Rosa Data**

**1.**

The first prong of Mr. Fryer's restitution claim addresses the so-called Santa Rosa data. He contends the Alliance has no right to data pertaining to water usage by the City's residents and should pay him a little over $26,000 for it, destroy all its reports that refer to it, and never make use of the data again. In other words, he wants a good deal more than what he previously agreed to in

the March 13th settlement. And what he wants would or could make the Alliance's future efforts in this area futile. According to Mr. Fryer, the Alliance obtained the data as a result of a court order the Seventh Circuit found invalid on appeal. But Mr. Fryer loses sight of the fact that the Seventh Circuit did not find the March 13th settlement agreement invalid. To the contrary, it held that the parties were bound by that to which they had agreed. It was this court (and the Alliance) which gave the settlement agreement a greater reach than it should have had.

Indeed, the Court of Appeals noted that some of the "language [in a memorandum opinion] suggests that [I] wanted Fryer to turn additional data over to the Alliance or a consultant." But it held that since "no such requirement appears in the injunction or in any judgment satisfying Fed.R.Civ.P. 58, Fryer [was] therefore under no obligation beyond those undertaken in the settlement agreement." *Alliance, supra*, 808 F.3d at 1157. Mr. Fryer's current contention that he was required to turn over the Santa Rosa data to the Alliance [Dkt. #39] is, at bottom, an objection to the holding of the Court of Appeals. But he cannot relitigate or quarrel with the Court's holding.

The record of the settlement conference of March 13th, which everyone agrees defined the parties' obligations, reads in pertinent part:

> MR. WIX [counsel for the Alliance]: With respect to point 2 and the turnover of data, Mr. Fryer will turn over *all utility data*. Subject to that data *requiring* a release of AWE getting those releases *from the case study utilities*. Mr. Fryer will provide AWE shortly with a list of who those are.

> MS. CASEY [counsel for Mr. Fryer]: Yes.

> *   *   *

> MR. WIX: So by March 14th close of business Mr. Fryer will provide us with the list of case study utilities who have confidentiality agreements. AWE will get the releases *from those case study utilities*. At which point Mr. Fryer will turn over all utility data within two weeks. That was not part of the description (inaudible).

\*　　\*　　\*

MS. CASEY: Certainly. Michelle Casey for James Fryer. That data will be conveyed to plaintiff in some sort of hard copy format, whether it is via CD or via flash drive.

MR. WIX: The data that is being turned over will not include Mr. Fryer's interviews, notes that he's taken during the course of this case -- or the project. Sorry. With respect to point No. 4, AWE will pay Mr. Fryer the sum of $25,000. We didn't talk about this specifically, but we would propose at least to pay that within 30 days after receipt of the utility data.

\*　　\*　　\*

THE COURT: That's a customary time frame for paying people. That seems reasonable.

MR. FRYER: I'm a little uncomfortable with that. How about two weeks (inaudible)?

\*　　\*　　\*

THE COURT: Well, what about simply 14 days after the exchange of the data and the exchange of releases?

MS. CASEY: So two –

MR. WIX: Fine.

[Dkt. #32, at 3-6](Emphasis supplied).

Mr. Fryer, who obviously was not shy about up speaking up on his own behalf and who had intimate familiarity with the matters under discussion, provided the Alliance with names of the case study utilities contemplated in the agreement. The Alliance was able to secure releases from all but the City of Santa Rosa. However, Mr. Fryer did not have a confidentiality agreement with the City, so there was no release to be had. Mr. Fryer never denied this. On May 12, 2016, Mr. Fryer gave the Alliance all the data from the case study utilities except for the data from the City of Santa Rosa, complaining that the Alliance had not obtained a release as required by the terms of the agreement.

The question of whether there had been compliance on either side with this portion of the agreement was one of several that unraveled the parties' relationship in the wake of the March 13 agreement. The Alliance maintained that because Mr. Fryer didn't have a confidentiality agreement with the City of Santa Rose, it would not provide a release from a confidentiality obligation that never existed. Mr. Fryer refused to turn over the Santa Rosa data. Eventually, this dispute became part of the Alliance's motion to enforce the settlement agreement.

At the hearing on that motion on June 10, 2014, it became clear that Mr. Fryer indeed did not have a confidentiality agreement with the City of Santa Rosa. Instead, as his counsel explained, there was a postcard authorization form between the City and each of the water customers in the survey, in which the customers authorized the City to release their water usage data to the researchers conducting the study. [Dkt. #77, at 31; Dkt. # 37-2, at 5]. The postcard form said simply that the account holder either did, or did not authorize the City of Santa Rosa to release water use data for the purposes of the study, and that it was understood that all account information would be kept confidential. [Dkt. #37-2, at 5]. Although Mr. Fryer offered to sign a data confidentiality agreement with the City of Santa Rosa [Dkt. #37-2, at 3], there is absolutely no evidence that he ever did or that, given the postcard system, the City of Santa Rosa felt one was necessary. Mr. Fryer's counsel conceded that there was no confidentiality agreement with the City of Santa Rosa at the June 10th hearing. [Dkt. #77, at 34]. That was the end of the issue.

As there was no confidentiality agreement, Mr. Fryer could not legitimately or cogently demand a release from one. [Dkt. #77, at 41]. Regardless of what the parties may or may not have agreed to in the wake of the March 13th agreement – they even came up with a data turnover to an intermediary as Mr. Fryer continued to balk at turning over the data – it was clear that Mr. Fryer was

not excused from turning over the Santa Rosa data because the contemplated confidentiality agreement between him and the City never existed. [Dkt. #77, at 46-47]. There was no other resolution than for Mr. Fryer to comply with the terms of the March 13[5] agreement and turn over the data. The transcript reads as follows:

> The motion to enforce the settlement agreement is taken under advisement, except to the extent that it relates to the obligation of the defendant to turn over the Santa Rosa data to AWE. That aspect of the motion is granted. And the defendant is ordered immediately to turn over the "Santa Rosa data" to AWE.
> I think that argument is frivolous. . . But that was – [T]hat was agreed to from the beginning. That was a component. I don't know how much or significant of a component of the -- of the report it's going to be, but there was no question that from the very outset he was going to give whatever data he had to the plaintiff so they could do their report.

[Dkt. #77, at 49, Tr. of Proceedings of 6/10/14 hearing]. The ruling was reduced to an order that day, June 10, 2014. [Dkt. #39].

In other words, Mr. Fryer was obligated to do what he had agreed to do under the terms of the March 13th agreement. That was no more or no less than what the Seventh Circuit determined when it said that Mr. Fryer was "under no obligations beyond those undertaken in the settlement agreement." *Alliance for Water Efficiency*, 808 F.3d at 1157. While the June 10th order did not comport with the applicable Federal Rules of Civil Procedure, the March 13th settlement agreement remained in place as the Seventh Circuit made clear.

**2.**

Mr. Fryer has no viable claim for restitution based on his turnover of the Santa Rosa data.[6]

---

[5] Mr. Fryer continues to ignore the March 13th agreement even in his reply brief in support of his motion for restitution. [Dkt. #104, at 6]. The June 10th order simply directed him to comply with the March 13th agreement, which he was obligated to do anyway.

[6] In his reply brief, Mr. Fryer submits that in its September 16, 2016 order, the court called the Santa

continue...

Indeed, Mr. Fryer even requested that the Seventh Circuit remand the case to the district court for an order compelling the Alliance to return the Santa Rosa data to him. (Appellant's Brief and Appendix, at 51). The Seventh Circuit did not do so. This strongly indicates that the Seventh Circuit thought very little, or nothing at all, of Mr. Fryer's request. *See United States v. Husband*, 312 F.3d 247, 251 (7th Cir. 2002)("the implication is that for arguments not addressed in the remanding opinion ... we thought so little of the point that we did not see a need to discuss it, . . . ."). The Mandate provided that the judgment of the District Court is "REVERSED, with costs, in accordance with the decision of this court entered on this date." [Dkt. #88]. The Bill of Costs awarded by the Court of Appeals totaled $374.46. [Dkt. #87].

If Mr. Fryer somehow wants to resurrect his theory about the release from the City of Santa Rosa – in other words, that the Alliance somehow breached the March 13th agreement – that would seem to be a matter for another lawsuit, which Mr. Fryer has chosen not to bring. *See Alliance for Water Efficiency*, 808 F.3d at 1157. Any future suit must comport with the provisions the parties

---

[6]...continue

Rosa data turnover "[t]he most troublesome and conspicuous issue, notwithstanding the briefs' laconic treatment of the issue." [Dkt. #104, at 7]. But the entire order makes clear why this statement was made and what was meant by it. Simply put, Mr. Fryer's refusal to turn over the Santa Rosa data when there was no confidentiality between Mr. Fryer and the city of Santa Rosa seemed unwarranted. [Dkt. #85, at 26].

In his reply brief in support of his motion for restitution, Mr. Fryer tries to explain not that he had a confidentiality agreement with the City of Santa Rosa – which was what he claimed originally – but that, through the City, he had one with every single citizen in that municipality. [Dkt. #104, at 9]. So, one must suppose that his claim is that every citizen responding had to provide the Alliance with a release. With a population of over 170,000 that's quite a few releases, even if, as was certain, only a small percentage responded..

Mr. Fryer's argument ignores common sense, which ought to foreclose its acceptance. *See John v. Resolution Trust Corp.*, 39 F.3d 773, 778 (7th Cir.1994). *Compare Dispatch Automation, Inc. v. Richards,* 280 F.3d 1116, 1119 (7th Cir. 2002)("'[c]ommon sense is as much a part of contract interpretation as is the dictionary or the arsenal of canons.'").

chose in their settlement agreement, as the Seventh Circuit held, and with appropriate jurisdictional requirements.

Finally, there is Mr. Fryer's request that the Alliance be ordered to destroy all digital and hard copies of its report and cease any use of any report containing the Santa Rosa data. There is nothing in the March 13th agreement that supports such a request, and the Alliance, like Mr. Fryer, is "under no obligations beyond those undertaken in the settlement agreement." 808 F.3d at 1157. Mr. Fryer has failed to demonstrate that he is entitled to restitution based on his turnover of the Santa Rosa data.

### D.
### The Alliance Publishes First

The second prong of Mr. Fryer's claim for restitution rests on his idea that the Alliance in violation of the settlement agreement published its report before he did. While the right to publish first potentially had value, *see Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539I, 564 (1985), neither Mr. Fryer nor his lawyers insisted that the settlement agreement allow Mr. Fryer the right of first publication. Thus, the March 13th agreement does not provide for any order of publication – certainly not one in Mr. Fryer's favor. Section 2 of the Restatement provides that a valid contract defines the obligations of the parties as to matters within its scope, displacing to that extent any inquiry into unjust enrichment. Restatement (Third) of Restitution and Unjust Enrichment § 2 (2011). *See also supra* at 3. Mr. Fryer can't fault the Alliance for abiding by the terms of the settlement agreement. Or seek restitution where it did.

The Alliance published its report in July 2015, while the appeal was pending before the Seventh Circuit. Mr. Fryer characterizes this as the Alliance "taking a risk" on the outcome of the appeal. If the Alliance was not successful, so the argument goes, it would have to make restitution

to Mr. Fryer. Mr. Fryer assigns a value of over $100,000 to the benefit of publishing first. As noted earlier, as the Seventh Circuit stressed, the March 13 settlement agreement controlled the parties' rights and obligations. While it referred it to the separate reports Mr. Fryer and the alliance would be publishing, it did not prescribe a sequence for publication. It merely said:

> James Fryer may prepare his own report for DWR provided he removes all references to the Alliance for Water Efficiency, AWE, in his report. Conversely, AWE will prepare its own report for the remaining funding participants of the Project Advisory Committee excluding DWR. And in completing the report, AWE will take out any reference to Fryer and will not deal with DWR.

[Dkt. #32, at 3]. No time restrictions on or order of publication were imposed or agreed to by the parties or their lawyers. As the Seventh Circuit stressed, the parties were under no obligations beyond those in the agreement. *Alliance for Water Efficiency,* 808 F.3d at 1157.

In sum, there was nothing in the parties' settlement agreement directing the order of publication, nothing to suggest that the Alliance had to hold off until Mr. Fryer published, nothing giving Mr. Fryer any special publishing privileges, and nothing to suggest that Mr. Fryer had to hold off until the Alliance published. If the right to publish first was truly worth the $100,000 as Mr. Fryer now claims, surely he would have had the matter resolved in his favor by the September 13 agreement. He did not, and he cannot now complain that the Alliance was free to publish its report whenever it liked, and so was Mr. Fryer.

In fact, under his settlement agreement, Mr. Fryer had ample opportunity to publish first (if he so chose), because the Alliance didn't exactly race to publish its report. The settlement agreement was March 13, 2014, and the Alliance didn't publish its report until July 29, 2015, sixteen months after the agreement. So, what was Mr. Fryer doing during all that time? According to him, he had completed his report – or at least had a final draft to circulate for approval – by April 21, 2014. [Dkt.

#37, at 6]. The interpretation of the settlement agreement that Mr. Fryer contends prevented him from publishing his report was not entered until September 24, 2014. [Dkt. #96-2, at 4]. Thus, for a period of about six months, given the fact that the parties agreed they had a binding agreement as of March 13th – a position Mr. Fryer has maintained throughout this litigation all the way up to the Seventh Circuit, even though he continues to ignore its terms, even in his reply brief [Dkt. #104, at 10-12] – Mr. Fryer was free to publish his report, with the only restriction being that he could not refer to the Alliance in it. Yet, he didn't publish in that six-month window.

Mr. Fryer's "explanation" – really no more than a contention – for why he didn't publish after the order of September 24, 2014 – is not very convincing. His story goes like this:

> Removing the names of the advisory group members and funders would have violated the contractual promises to the funders that they would be acknowledged in the final report, would have been contrary to established ethical standards for report of this kind, would have undermined the credibility of Fryer's report, and would have been contrary to the express statements of the California Department of Water Resources (DWR) and the Metropolitan Water District of Southern California (MWD) – funders and advisory group members – that they expected Fryer's report to acknowledge their contributions and to reflect a collaborative project. Fryer Decl. ¶¶ 16-21, 34.

[Dkt. #96-2, at 4-5]. The only support for this stance is Mr. Fryer's 33-page declaration, with 90 pages of attached exhibits. Unfortunately for Mr. Fryer, the value of this lengthy submission as support for his claim for restitution pales into insignificance relative to its size. It is peppered with mischaracterizations of the record and, for the most part, is unsupported by the supposed evidence on which it relies.[7]

---

[7] No discovery has been taken by the Alliance on Mr. Fryer's restitution claims. The Alliance has, however, moved to strike the declaration, for a number of reasons. That motion is denied, and the declaration will be considered, but only to the extent it is properly supported and is found to have merit.

We begin with Mr. Fryer's contention that removing the names of the advisory group members and funders would have violated the contractual promises to the funders that they would be acknowledged in the final report. In the cited portion of his declaration, Mr. Fryer rather vaguely refers to agreements he had with funding agencies that he says he would violate if he did not name them in his report. [Dkt. #96-3, at ¶16]. He is apparently referring to the "documents reflecting the promise" that all financial contributors would be recognized that he mentions a couple of paragraphs later. [Dkt. #96-3, at ¶18]. But all of the documents to which he cites are letters from *the Alliance* to the funding agencies. [Dkt. #102, at ¶18 (citing Dkt. #5-2, at 2; Dkt. #5-3, at 2; Dkt. #5-4, at 2; Dkt. #5-5, at 2; Dkt. #5-6, at 2)]. Mr. Fryer is neither a signatory on, nor a party to, any one of them, and hence he has no contractual relationship with the recipients. Thus, the materials he claims show that he was contractually obligated to name these organizations in his report show nothing of the kind.

Mr. Fryer also claims that, during the March 13th settlement hearing, he was ordered, over his objection, not to contact the advisory group members unless they contacted him first. [Dkt. #96-3, at ¶16]. That's inaccurate. As the ten points of the agreement were read into the record, Mr. Fryer made absolutely no objection, despite the fact that he was invited to correct the Alliance's counsel if something was wrong as problems might come up. [Dkt. #32, at 2-3]. It was not until over a half an hour had passed before Mr. Fryer raised any concerns at all, and he raised them as to the very first point, point number one. [Dkt. #32, at 10]. His attorney said she had no idea what his issue was. [Dkt. #32, at 11].

Moreover, contrary to his declaration, Mr. Fryer and his counsel agreed that Mr. Fryer would not contact PAC/funders unless they contacted him first. A restraint on Mr. Fryer's ability to solicit

a funder or PAC member – which he said he would not do, as evidenced below – is not the same as a promise that he won't use a funder's name in his report. In his settlement agreement, he promised the former, not the latter. He was free, therefore, to include in his report any other funders besides the Alliance he wanted to mention. Here is what occurred during the settlement conference on March 13th:

> MR. FRYER: But, your Honor, if a utility contacts me and says I want to provide input into your finalization, do I have to tell them no, I will not talk to you in any way, shape, or form about this?
>
> MR. WIX [Alliance's counsel]: No.
>
> MS. CASEY [Mr. Fryer's counsel]: No.
>
> > *       *       *
>
> MS. CASEY [Mr. Fryer's counsel]: I think, I'm hoping I'm right on this, that our key concern that you articulated is that we're going our separate ways. We get that. And, you know, he's preparing a report for DWR. But if other utilities contact him and want input, that's fine. That's how it is. . . . We can't control (inaudible)
>
> MR. WIX [the Alliance's counsel]: We don't have a problem with that.
>
> > *       *       *
>
> THE COURT: You're going to tell them, if you want to, what the terms of the settlement are at least as to this. And that, he's agreed not to solicit them. But, of course, if they want to contact him, they can. Okay.
>
> MS. CASEY [Mr. Fryer's counsel]: That's all right.
>
> THE COURT: That's good.
>
> MR. WIX [the Alliance's counsel]: Good.

[Dkt. #34-1, at 12-13, 16, 19].

Thus, the parties clearly agreed that Mr. Fryer would not solicit funders, but was free to respond to their inquiries and with the exception of the Alliance's name, he was not prohibited from

identifying them in his separate report without their prior permission. And he could do so whether he was contacted or not. But, it was never agreed or even discussed what the order of publication should be or that Mr. Fryer had the right to publish first. He is bound by the agreement he made and is not free to import terms that he did not see fit to insist on March 13th when he settled the case.

While the Seventh Circuit found that this was not a part of the March 13th settlement agreement, seemingly because it was not one of the ten points the Alliance's counsel read into the record, 808 F.3d at 1155-57, there is nothing in the record of that hearing that Mr. Fryer was ordered, over his objection, not to contact the utilities unless they contacted him first. His lawyer's statements quoted above – "We don't have a problem with that" and "[t]hat's all right" – are not objections. Quite the contrary. Mr. Fryer and his lawyer agreed that they would not *contact* PAC members unless they were first contacted. To call acquiescences and agreements to propositions objections is not faithful to the language that was used. It should be emphasized that none of this is contrary to the Court of Appeals' interpretation of what the parties agreed to in their settlement of March 13th.

When relying on the court's discretion to grant equitable relief, arguing in other than the utmost of good faith is not the best path to take. *Compare Campbell v. Clarke,* 481 F.3d 967, 969 (7th Cir.2007); *In re Mississippi Valley Livestock, Inc.,* 745 F.3d 299, 307 (7th Cir. 2014). To make matters worse, even though Mr. Fryer agreed at the March 13th settlement conference that he would not contact the utilities unless they contacted him first, he now indicates in his declaration that, nevertheless, he *did* contact the utilities, asking whether they wanted their names removed. [Dkt. #96-3, ¶ 17].[8] In short, it certainly appears that Mr. Fryer did exactly what he agreed he wouldn't

---

[8] Prior to the March 13th settlement agreement, there would have been no reason for Mr. Fryer to circulate a draft of his report among the utilities and ask if they wanted him to remove their names. [Dkt. # continue...

do.

Mr. Fryer further submits that "because [he] had involved and obtained input from the advisory group members over the course of more than a year, [he] could not refuse to identify the advisory group members in the final report or to acknowledge their contributions to it." [Dkt. #96-3, ¶ 17]. But this is not true. At least not legally. As the Court of Appeals observed, the March 13th settlement agreement did not preclude Mr. Fryer from acknowledging anyone's input except the Alliance's. And this includes Santa Rosa and/or PAC members. Indeed, the Order of 10/27/15 specifically said "the parties agreed that nothing in the March settlement agreement or in my opinion involving the motion to enforce settlement agreement, was intended to preclude Mr. Fryer from being able to make reference in his separate report for DWR to the fact that Santa Rosa and/or one or more members of the PAC contributed for Mr. Fryer's study raw data on which his report relied." [Dkt. #52, 10/27/14]. So, not only was Mr. Fryer never forbidden to acknowledge the utilities' input, neither he nor his attorney thought he couldn't.

Finally, Mr. Fryer complains that "the California Department of Water Resources and the Metropolitan Water District of Southern California – funders and advisory group members – [expressly stated] that they expected [his] report to acknowledge their contributions and to reflect a collaborative project." He has lost sight of the fact that, whether under the terms of the March 13th settlement agreement, as construed by the Seventh Circuit, he was free to acknowledge the California Department of Water Resources' contribution. [Dkt. #33, at 2]; 808 F.3d at 1155. So, that could have played no role in his not publishing his report at any point in this saga. In any event, peoples' hopes

---

[8]...continue

96-3, ¶ 17 ("None [of the utilities] (other than AWE) stated disagreement with the report formatting or conclusions and none (other than AWE) had asked to be removed.")].

and expectations could not legally bind Mr. Fryer and his conclusion that he had to honor those expectations – a conclusion never communicated to the Alliance – cannot be controlled and impose liability on the Alliance. "'Secret hopes and wishes count for nothing.'" *Newkirk v. Village of Steger*, 536 F.3d 771, 774 (7th Cir. 2008).

In his declaration, Mr. Fryer claims he had a conversation with a Peter Bostrom, whom he describes as DWR's representative, on November 19, 2014, in which Mr. Bostrom told him that DWR wanted all funders and advisory group participants acknowledged in Mr. Fryer's separate report. Mr. Fryer insists that he "could not issue a report that was contrary to DWR's express requirements . . . ." [Dkt. #96-3, at 9]. But saying so does not make it so. *Allen v. GreatBanc Trust Co.*, 835 F.3d 670, 679 (7th Cir. 2016); *United States v. 5443 Suffield Terrace, Skokie, Ill.,* 607 F.3d 504, 510 (7th Cir.2010). Nor does repetition. *Dennis v. Kellogg Co.*, 697 F.3d 858, 866 (9th Cir.2012).

In the binding settlement read into the record at the March 13th conference, Mr. Fryer had agreed to omit any mention of the Alliance in his report. Yet, the Alliance was a major funder (if not the largest contributor) of the whole project. Thus, even if one credits the statements in the declaration, Mr. Fryer had agreed 8 months earlier in a binding settlement agreement to do that which he now claims he was told would be at odds with the wishes of DWR. Mr. Bostrom's *post hoc* wishes cannot trump Mr. Fryer's settlement agreement in which he admittedly obligated himself to exclude the project's largest funder.

Moreover, the settlement agreement provided that "AWE will prepare its own report *for the remaining funding participants of the Project Advisory Committee* excluding DWR. And in completing the report, AWE will take out any reference to Fryer and will not deal with DWR."

(Emphasis supplied). The agreement envisioned that the Alliance would be preparing a report for the remaining funding participants of the Project Advisory Committee. And while the Seventh Circuit held that Mr. Fryer did not promise not to name other funders in his report, he certainly was aware that they were going to be a part of the Alliance's separate report, which was going to deal with the same subject matter as Mr. Fryer's report.

The result is no different if one accepts Mr. Fryer's interpretation that the quoted statements were the "express requirements" of Mr. Bostrom. The settlement agreement allowed Mr. Fryer to publish his report and name anyone he chose other than the Alliance and the DWR. If Mr. Fryer chose to honor DWR's wishes or instructions on who should be named in the report, he must look to himself. Voluntary decisions have binding consequences. *Crowe ex rel. Crowe v. Zeigler Coal Co.,* 646 F.3d 435, 444 (7th Cir.2011). And even if Mr. Bostrom had the authority to make demands on Mr. Fryer (under some hitherto unmentioned arrangement with Fryer), Mr. Fryer's claimed willingness to bow to the alleged "requirements" of DWR are legally irrelevant so far as the Alliance is concerned.

Then there is the email from the Metropolitan Water District of Southern California (MWD), to Mr. Fryer, dated May 3, 2013, in which the MWD says it wished to be identified as a funding partner for the study. [Dkt. #96-3, at 36]. Of course, MWD's *wishes* expressed to Mr. Fryer a year before the settlement agreement weren't binding on the Alliance (or Mr. Fryer for that matter), and wouldn't in any event have prevented Mr. Fryer from publishing his report any time after the settlement agreement. While "all parties to a litigation tend to become partisans," *United States v. National City Lines,* 334 U.S. 573, 601 (1948)(Frankfurter, J., dissenting), the May 3, 2013 email

to Mr. Fryer is the flimsiest of reeds on which to base a demand for $105,870.50.[9]

That provides a segue into the basis for Mr. Fryer's demand for restitution. He says he arrived at this figure by estimating the value of the uncompensated time he put into the project. He claims that he was fine with performing a certain amount of work without pay because he had "the *expectation* of being first to publish and the value of the greater amount of work he actually performed is a fair way of measuring damages when he was denied recognition as the first to publish." (Emphasis supplied) [Dkt. #96-2, at 14]. But given the settlement agreement which allowed either party to publish first, Mr. Fryer had no reasonable expectation of first publication. And unreasonable expectations will never control. *Smith v. Continental Casualty Co.*, 347 Fed.Appx. 812, 814 (3rd Cir.2009).

Once again, despite successfully maintaining that the March 13th settlement agreement represents the only binding agreement between the parties, and never insisting that his "expectation" that he could or should be the first to publish, Mr. Fryer now effectively puts his settlement agreement out of view. As already explained, there is nothing in the March 13th agreement that dictates the order of publishing. Both the Alliance and Mr. Fryer were thus free to publish their reports when they liked. If Mr. Fryer had an *expectation* of publishing first, he has arrived at it by ignoring the agreement he made on March 13, 2014. And, if the right to publish first was really

---

[9] Mr. Fryer also submits that industry standards required him to list all contributors to his report. [Dkt. #96-3, ¶21]. But he provides no support for this, at least not until his reply brief. [Dkt. # 104, at 11-12]. That's too late. "A reply brief is for replying" not for raising essentially new matter that could have been advanced in the opening brief. *Hussein v. Oshkosh Motor Truck Company*, 816 F.2d 348, 360 (7th Cir.1987) (Posner, J., concurring). Arguments and evidence that could have been raised in the opening brief but are first raised in a reply brief are waived. *Judge v. Quinn*, 612 F.3d 537, 542 (7th Cir.2010); *Cornucopia Institute v. U.S. Dept. of Agriculture*, 560 F.3d 673, 678 (7th Cir.2009). In any event, claimed industry standards– which were never mentioned by Mr. Fryer at the settlement conference or in the settlement agreement– do not take precedence over Mr. Fryer's settlement agreement with its binding obligations.

worth over $100,000 as Mr. Fryer and his attorney claim, they surely were aware of it and would have insisted on it in the settlement agreement. They did not. Their silence is deafening. *Compare United States v.. Lowery*, 166 F.3d 1119, 1124 (11th Cir.1999)(noting that lawyers would have raised the issue in every district court in every circuit in the country. They did not. "The sound of their silence is deafening."). Indeed, a number of cases have found significant a litigant's failure to raise an issue at the settlement conference, *See, e.g.*, *Waite v. Schoenbach*, 2011 WL 3425547, at *4 (S.D.N.Y. Aug. 5, 2011); *Shoemaker v. Estis Well Serv., L.L.C.*, 122 F. Supp. 3d 493, 516 (E.D. La. 2015), or in advance of one. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010); *United States v. Manning*, 107 F.3d 5 (2nd Cir. 1997); *In re Nat. Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 389 (E.D. Pa. 2015); *Awar v. Fairfield Greenwich Ltd.*, 728 F.Supp.2d 372, 457–58 (S.D.N.Y.2010) (holding that a contract's "deafening silence" on third party beneficiary rights demonstrated a lack of intent to confer benefits on the third party).

In sum, with no settlement provision mandating who could publish first, and despite the prospect that the Alliance could and might issue its report before Mr. Fryer, Mr. Fryer agreed to a payment from the Alliance of $25,000 for past work on the project that no one disputed he had performed. He is bound by his agreement. 808 F.3d at 1157. The $100,000 demand is denied.

### E.
### Delayed Payment

The final prong of Mr. Fryer's claim for restitution is the fact that the Alliance did not pay him the $25,000 he was owed under the March 13, 2014 settlement agreement until January 21, 2015. [Dkt. #101-5]. Mr. Fryer raised this very issue with the Seventh Circuit, requesting that the Court not only reverse, but remand with instructions to consider appropriate relief for delayed payment. (Appellant's Brief and Appendix, at 50-51). The Seventh Circuit did neither. This is

significant given the "rule of mandate." Indeed, this court held in *United States v. Husband*, that " the implication is that for arguments not addressed in the remanding opinion . . . [the Court] thought so little of the point that [it] did not see a need to discuss it . . . . The court's silence on the argument implies that it is not available for consideration on remand." 312 F.3d at 251. "Whether the argument was rejected *sub silentio* or was surrendered, it was unavailable on remand." *Barrow v. Falck*, 11 F.3d 729, 731 (7th Cir. 1993)(cited approvingly by *Husband)*. *See also, The Hemmer Grp. v. Sw. Water Co.*, 2016 WL 4488062, at *1 (9th Cir. 2016)("The rule of mandate is jurisdictional, not merely an expression of common judicial practice.").

### CONCLUSION

Mr. Fryer's motion for restitution [Dkt. # 96] is denied.



**ENTERED:** _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** 1/18/17